STATE v. LEROY GRAVES, Appellant.—No. 38734.—182 S. W. (2d) 46.

Division Two, June 5, 1944.

*William M. Stringer* and *Ray L. Falzone* for appellant.

*Roy McKittrick*, Attorney General and *John S. Phillips*, Assistant Attorney General, for respondent.

ELLISON, J.—The appellant, 24 years old, was convicted of murder in the second degree in the circuit court of Howard county on change of venue from Randolph county, and his punishment assessed by a jury at 31 years' imprisonment in the penitentiary for fatally shooting one George Erickson, 60 or 65 years old. The sole defense on the merits was self-defense. Appellant assigns eight procedural errors, which we shall discuss in order after stating the facts briefly.

The State's evidence showed that the appellant and deceased and some other negroes lived together at Moberly in a small house near the railroad tracks. A white man named Otis Honey stayed with them. He testified appellant started an altercation with the deceased, charging the latter had been calling his (appellant's) mother names. They fought, and Honey fled from the house. Outside, he heard a pistol shot. Appellant testified the deceased was the aggressor and had struck him twice with a stove poker, knocking him to the floor, from which position he shot deceased with his pistol. He said he had got the pistol a few minutes before that with the intention of pawning it.

About an hour after the homicide he went to the home of a negro friend and gave him the pistol with instructions to keep it until he called for it, at the time explaining, "I am in trouble, and I guess I will have to go to the penitentiary." In about a half-hour appellant returned, reclaimed the pistol and left hurriedly. He gave it to another man named Fowler, who turned it over to the sheriff. Appellant had threatened twice to kill the deceased, once about two months before the homicide, and the other time a month before. On cross-examination under Sec's 1916 and 4081,[1] and over his counsel's objection based on constitutional grounds, appellant was asked, for the purpose of impeaching his credibility as a witness, if he had been previously convicted of felonious assault in 1935, and of petit

---

[1]All references herein to our statutes are to R. S. 1939, and Mo., R. S. A. same sections, unless otherwise noted.

larceny in 1930, 1931 and 1937. He answered in the affirmative as to the felony and one of the misdemeanors, and denied the two others.

The first assignment arises on the record proper. It is that the information filed in the circuit court was fatally defective, and that the trial court therefore erred in overruling appellant's motion to quash it. The defect alleged is that the opening part of the information states the appellant "*of* the county of Randolph and State of Missouri, on or about the 8th day of January, 1941," committed the fatal assault. Appellant says the word "of", which we have italicized, is merely descriptive of the accused as a resident of Randolph county, and does not charge the homicide was committed there. He asserts the word "at" should have been used, and that without it no venue was laid. Sec. 3944 provides the venue need not be stated in the body of the information, but that the county or other jurisdiction named in the margin thereof shall be taken to be the venue for all the facts stated in the body of the same. Appellant argues this means the venue must appear *somewhere* in the information, notwithstanding the statute of jeofails, Sec. 3952, declares an information ▇ or indictment shall not be deemed invalid "for want of a proper or perfect venue; nor for want of any venue at all."

We would be unable to see any merit in this contention even if appellant were correct in saying the body of the information wholly fails to state the venue of the crime. For we think Sec. 3952 would control. Furthermore, the information is captioned, "In the Circuit Court of Randolph County, February Term, 1941, Moberly, Missouri," thus bringing it within the provisions of Sec. 3944, supra. But beyond all that, the use of the word "of" for "at" is merely a typographical error, or at least immaterial. In the subsequent part of the information the words "then and there" are used repeatedly, referring to the date and place earlier stated, that is to say, to Randolph County, which is the only county anywhere mentioned therein. Thus, a few lines later in alleging the assault upon the deceased it says, "upon one George Erickson, *then and there being.*" Again, in describing the fatal wound it alleges the same was inflicted on the deceased "*at* the County of Randolph and State of Missouri." And the concluding clause summed up: "And so (the prosecuting attorney) on his oath does say that (the appellant) him (the deceased) in the manner and by the means aforesaid, feloniously (etc.) *at* the County of Randolph and State of Missouri did kill and murder, against the peace and dignity of the State."

The remaining assignments are founded on appellant's bill of exceptions. But the State challenges the right of this court to consider the bill of exceptions, alleging that appellant failed to file his motion for new trial in the circuit court within the time required by Sec. 4125. It is fundamental that matters of exception will not be reviewed on appeal unless they were first presented to the trial

court in a motion for new trial; and it is further the law that the motion will be ineffectual if it was not filed in due time. The verdict in this case was returned on October 29, 1941. On the next day the appellant moved that the time for filing his motion for new trial be extended for a period of thirty days, and the trial court granted the extension by entry of record. The motion was filed on December 1, 1941, thirty-three calendar days after the return of the verdict. Was this sufficient on a proper construction of Sec. 4125?

The statute provides that such motions shall be filed before judgment and within four days after the return of the verdict: provided, on the application of the defendant, the court may extend the time for filing such motions for a period of thirty (30) days: but no further extension may be granted. The State contends this means the time may be extended *to* 30 days as a maximum. The appellant asserts the 30 day extension is *in addition* to the basic four days after the return of the verdict, as allowed in all cases. The statute was reenacted to read as aforesaid by Laws Mo., 1939, p. 358. We are unable to find that it has since been construed by this Court on the point under discussion, though there are two decisions that deal with extensions under it. State v. Morris (Mo. Div. 2), 169 S. W. (2d) 379, and State v. Pruitt (Mo. Div. 2), 169 S. W. (2d) 399. And in State v. Jones, 164 S. W. (2d) 85, 89-90, decided by the Springfield Court of Appeals, there is an obiter statement that such extensions cannot exceed 30 days from the date of the verdict.

The Attorney General relies on State v. LaBreyere, 333 Mo. 1205, 1206(2), 64 S. W. (2d) 117, 118(4), which held that under the statute before the 1939 reenactment (when it was Sec. 3735, R. S. 1929) the extension period ran from the date of the verdict. But that statute, while generally resembling the present Sec. 4125, was notably different with respect to the time allowed. It first provided, exactly as now, that such motions should be filed before judgment and within four days after the return of the verdict. But to that was annexed the condition, "if the term shall so long continue; and if not, then before the end of the term." That clause was stricken out in the 1939 reenactment thereby giving the movant an unconditional, basic four days. And the proviso in the 1929 statute authorizing an extension of time also was very different. It said: "provided, that the court shall have power in any case for good cause shown to extend the time for filing such motion for a period not exceeding ten days *from the date of the return of the verdict.*" In the reenacted 1939 statute the phrase we have italicized, "from the date of the return of the verdict" was stricken out; the number of days was changed from ten to thirty; and the court was authorized to grant a flat extension of 30 days (perhaps as a maximum) on application of the *defendant.*

The Act was Senate Bill No. 363. When it was returned to the General Assembly by Governor Stark with his approval (2 Senate Journal, 1939, p. 1857) he said:

"Further, it will be noticed that the thirty (30) days' period is not fixed to begin at any specified time. Senate Bill No. 363 does not provide, as does the existing statute, that the extension of time shall be from the date of the return of the verdict, and leaves a question open as to whether the extension of thirty (30) days is from the date the application is made, or thirty (30) days from the verdict, or thirty (30) days from the last day of court. I am inclined to the view, however, that under Senate Bill No. 363, the court will probably hold that the thirty (30) days period will begin to run from the verdict."

But we are unable to agree with the view expressed in this message. The Bill throughout indicated an intention to liberalize the requirements of the 1929 statute as regards the time allowed for filing motions for new trial. If the 30 day period begins to run from the date of the verdict, as the basic four days specifically does, then the *extension* would only be 26 days.

The word "extension" ordinarily implies the existence of something to be extended.[2] Thus in the Scott and Paul cases, just cited in the margin, this court held a trial court could not extend the time for filing a bill of exceptions beyond the time already fixed, if such extension was granted after the expiration of the time first limited. The Scott case said: "The word 'extended' as employed in this statute (Sec. 2168, R. S. 1889) means 'prolonged'; and of course a *prolongation* of time cannot occur *after* the time originally limited has *expired*." These cases, it seems to us, are authority for the view that an extension of time means time *added* to a period of time already granted—unless, of course, the order should disclose a contrary intention. In this case the 30 day extension should be added to the basic four days, making 34 days. Since the bill of exceptions was filed in 33 calendar days it was in time. It is unnecessary to consider appellant's further contention that Sundays are not to be reckoned in counting the 30 days, as was held of the 10 days extension under Sec. 3735, R. S. 1929, in State v. Ryan (Mo. Div. 2), 50 S. W. (2d) 999(3).

The next assignment is that the court erred in overruling appellant's plea in abatement. The grounds stated therein were that before he waived the preliminary hearing required by Sec. 3857 et seq., no attorney was appointed to represent him, and he was not informed

---

[2] 15 Words & Phrases (Perm. Ed.), "Extension," p. 798; State v. Scott, 113 Mo. 559, 561, 20 S. W. 1076, 1077; State v. Paul, 203 Mo. 681, 686, 102 S. W. 657, 658; Meyering v. Miller (Div. 1), 330 Mo. 885, 51 S. W. (2d) 65, 66; Rosin v. Lidgerwood, 86 N. Y. S. 49, 51; Schlosser Leather Co. v. Gillespie, 157 Tenn. 166, 6 S. W. (2d) 328, 331; Crane Enamelware Co. v. Smith, 168 Tenn. 203, 76 S. W. (2d) 644.

that he had the right to ask for an attorney and for a reasonable time to consult with him. The plea further alleged appellant was unable to read the complaint filed at that hearing or to comprehend its meaning if it had been read to him. In support of the plea he testified that the complaint was not exhibited to him or read to him, and that he was not advised of his right to have counsel and to require the testimony of the State's witnesses to be reduced to writing. He admitted he was asked if he wanted to waive the hearing and that he said he did; and he further acknowledged that he told the justice of the peace he had had a preliminary hearing before, on his previous arrest for felonious assault in 1935. He also knew the charge in this case was first degree murder, and remembered the justice and the prosecuting attorney asked him if he knew what a preliminary hearing was; and that he answered "Yes."

The justice of the peace testified he did read the complaint to the appellant, and that appellant said he knew what a preliminary hearing was, and had had one before. He said it meant he would be taken to the circuit court and furnished with a lawyer; and if he didn't have any money to pay for it the court would pay for it. The justice further testified appellant was told he could have an attorney then and there if he wanted one. The prosecuting attorney testified he handed the complaint to the appellant at the hearing and signed it in his presence; that the justice read it to him; and that the conversation with appellant occurred substantially as testified to by the justice of the peace.

The only authority cited by appellant on this point is Sutorius v. Mayor (Div. 1), 350 Mo. 1235, 170 S. W. (2d) 387, 398 ▆▆ (24) which announces the principle that a waiver is the voluntary relinquishment of a known existing legal right. In other words his contention is based on the theory that he did not know his rights. We think the trial court's ruling can and should be sustained on the ground that the evidence shows appellant did know his rights and what he was doing. But it is further to be remembered that a preliminary hearing under Sec's. 3857, 3873, does not put the accused on trial for the commission of the offense charged; but merely inquires whether there is probable cause for believing a felony has been committed and that the accused is guilty thereof—this for the purpose of binding him over for trial or committing him to jail in event he fails to give sufficient bail, if the required facts are found and the offense is bailable. In other words, the statutes are merely in aid of the arrest and detention of the accused, not of his conviction. This court en banc has recently held that our Constitution and statutes do not require the justice of the peace to appoint counsel for the accused at such hearings. Skiba v. Kaiser, 352 Mo. 424, 178 S. W. (2d) 373, 374(2). This assignment is overruled.

█ The next assignment complains that the trial court permitted the prosecuting attorney to cross-examine the State's own witness Thorpe, who said he couldn't read and write; and also because the court struck out the witness' answers to the cross-examination of appellant's counsel, and rebuked counsel. Thorpe was the man heretofore mentioned, to whom appellant first brought his pistol after the homicide, explaining, "I am in trouble, and I guess I will have to go to the penitentiary."

On cross-examination appellant's counsel read to the witness an excerpt from his testimony at the coroner's inquest, in which the witness had quoted the appellant as saying that if he never called for his pistol the witness could have it; and had further declared that was *all* the appellant said. In other words the excerpt omitted the above statement that appellant had said he was in trouble and guessed he would have to go to the penitentiary. The prosecuting attorney objected that appellant's counsel was not reading all the excerpt and started to interrogate the witness about the remaining part. Appellant's counsel objected that it was cross-examination of the State's own witness. The court permitted the prosecuting attorney to ask the witness to "tell everything that defendant said to you;" and the witness retold his story, this time incorporating appellant's statement about being in trouble and going to the penitentiary.

Following that, counsel for appellant resumed the cross-examination and pressed appellant at length on the point whether his answer in the excerpt was true; and whether he had "rehearsed" with the prosecuting attorney his added testimonial statement about appellant's going to the penitentiary. Finally the court directed counsel to include in his cross-examination another question and answer on the same point, which was in the transcript but not in the excerpt read—this to avoid confusing the witness. Appellant's counsel declined to do so and excepted. The court thereupon dictated into the record the part of the transcript to which he referred, the last question and answer therein being the ones ordered included, all as follows:

"Q. What did he say when he brought it down there?

"A. He just said, 'Here, Jack, I want you to keep this pistol until I call for it; if I never call for it it will always be yours.' Q. What else did he say? A. He never said no more; turned around and went on.

"Q. Did he say anything about being in trouble? A. He said he was in trouble and would have to go to the penitentiary again."

We think there was no reversible error in the trial court's ruling, in view of the decisions in this state.[3] Of these, the Littig case sus-

---

[3]Littig v. Urbauer-Atwood Heating Co., 292 Mo. 226, 247(8), 237 S. W. 779, 785(11); Rettlia v. Salomon, 308 Mo. 673, 680(3), 274 S. W. 366, 368(4); Peppers v. St. L.-S. F. Ry. Co., 316 Mo. 1104, 1115(12), 295 S. W. 757,

tains the court's ruling that the *entire* competent part of the transcript bearing ▮▮▮ on the point under inquiry should be read by the impeaching party. But nearly all the later cases cited tend to support appellant's contention; since they hold the impeaching party need read only such *portion* of the document as tends to impeach the witness, leaving it to the opposing party to read the remainder insofar as it may tend to rehabilitate the witness. And the Peppers case only holds the document should be shown to the witness *if he asks to see it*; declaring the practice condemned in the Littig case merely was *garbling* the facts, and failure of the cross-examiner to read the questions and answers about which *he* was inquiring.

Nevertheless all these decisions recognize the witness has a *right* to see the document from which the cross-examination is being made. The witness in this case was an ignorant negro who could not read and write. He did not know enough to ask to see the transcript, and if it had been shown to him he would have been unable to read it. The trial court has considerable discretionary latitude in controlling the cross-examination, State v. Rose, 339 Mo. 317, 326(4), 96 S. W. (2d) 498, 504(6). The prosecutor on redirect examination could have read the third question and answer to him. We think the trial court in the furtherance of justice to both sides was authorized to rule as it did.

▮▮▮ Next, appellant contends the court erred in compelling him to testify on cross-examination, for the purpose of impeachment under Sec's 4081 and 1916, that he had previously been convicted of felonious assault and two petit larcenies. It is argued the two statutes are unconstitutional because violative of his rights under Sec's 13 and 23, Art. II of the State Constitution and the Fourteenth Amendment of the Federal Constitution. Sec. 13, Art. II of the State Constitution forbids attainder by the General Assembly for treason or felony. Sec. 23, Art. II provides no person shall be compelled to testify against himself in a criminal cause. And the Fourteenth Amendment guarantees due process of law.

Sec. 4081 of our Statutes dates back 67 years to Laws Mo. 1877, p. 356. So far as pertinent here, that Act provided in substance that: (1) the accused in a criminal case should not be an incompetent witness; (2) but should not be required to testify; (3) and should not be prejudiced by his failure to testify. The Act was amended or reenacted to its present form two years later in the Revision of 1879, and split into two statutes, then Sec's 1918 and 1919, now Secs. 4081

---

761(11); State v. Stallings, 326 Mo. 1037, 1046(5), 33 S. W. (2d) 914, 917(10); Aetna Life Ins. Co. v. K. C. Elec. Lt. Co., 184 Mo. App. 718, 724(4), 171 S. W. 580, 581(4, 5); Showen v. Met. St. Ry. Co., 191 Mo. App. 292, 177 S. W. 791, 792(1); Fuller Co. v. St. L. Wholesale Drug Co., 219 Mo. App. 519, 533(5), 282 S. W. 535, 538(5); Shull v. Kallauner, 222 Mo. App. 64, 66(3), 300 S. W. 554, 555(3); Dietderick v. Mo. Iron & Metal Co., 222 Mo. App. 740, 746-7(3), 9 S. W. (2d) 824, 828(2, 3).

and 4082. The former embodies and extends the first two clauses of the original Act, and the latter the third clause. To Sec. 4081 were added the present explicit provisions that the accused should be liable to cross-examination as to *any matter referred to in his examination in chief*; and could be contradicted and *impeached as any other witness* in the case.

One year after the original enactment of the law, State v. Clinton, 67 Mo. 380, 389, 29 Am. Rep. 506, was decided in 1878. That decision undoubtedly induced the reenactment of the two statutes. Based on the original Act alone it held: "that a defendant in a criminal case who exercises the option which the law gives him, of testifying in his own behalf, is to be treated and held as any other witness, and is liable to be cross-examined on any other matter pertinent to the issue." The next year the reenacted Sec. 4081 *restricted* the cross-examination of the accused to matters referred to in his direct examination, State v. Hathhorn, 166 Mo. 229, 239(5), 65 S. W. 756, 759(5); but *added* the affirmative provision that the accused could be contradicted or impeached as any other witness. And sixteen years later by Laws Mo. 1895, p. 284, the present Sec. 1916, supra, was enacted, providing a person convicted of a criminal offense should be a competent witness; but that his conviction might be shown to affect his credibility, either by the record or on cross-examination, upon which he must answer questions relevant to that inquiry.

Looking now to the constitutionality of these statutes, it is to be noted the Clinton case pointed out that the accused, testifies, or not, at his own option; and that the statute, now Sec. 4081, is an enabling Act, since the accused would have been disqualified as a witness under the common law. The decision further quoted from a New York case that the defendant's becoming a witness (italics ours) : "was a voluntary act, and when he made himself a witness, under the privileges of the Act, he *waived the constitutional protection* in his favor and subjected himself to the peril of being examined as to any and every matter pertinent to the issue." This has been the rule in Missouri ever since the decision of the Clinton case, and generally is elsewhere. 70 C. J., sec. 1097, pp. 888, 893, 28 R. C. L., sec. 213 p. 626.

Along the same line, the earlier decisions in this State held the defendant in a criminal case was so far protected by Sec. 23, Art. II of the Constitution that he could voluntarily take the stand, give fragmentary testimony in his own behalf, and yet the State's counsel could not comment on his failure to deny or explain damaging evidence against him. But that rule as repudiated in 1913, in State v. Larkin, 250 Mo. 218, 234 (3), 240-1, 157 S. W. 600, 604(4), 46 L. R. A. (N. S.) 13. This decision declared the doctrine "has been exploded utterly" that cross-examination of an accused is limited by the constitutional rule against self-incrimination—this for the reason that he is excused from testifying at all unless he so elects. If he does testify, says the

Lakin case, he can look only to a statute for protection. And since Sec's 4081 and 1916 permit him to be impeached by proof of former convictions the same as any other witness, the Constitution will not shield him against it. So we must overrule appellant's contention to the contrary.

 Concerning the attainder. Appellant cites 12 C. J., sec. 820, p. 1108, and Cummings v. Missouri, 71 U. S. 277, 18 L. Ed. 356, defining a bill of attainder as "a legislative act which inflicts punishment without a judicial trial." In the Cummings case the United States Supreme Court denounced as an attainder the test oath provisions contained in Art. II of the Missouri Constitution of 1865, which required that every voter should execute and file a written oath that he had never given aid and comfort to alien enemies, specifically including the Confederate States of America, or submitted to the authority thereof except under overpowering compulsion; and forbade that any person who had not .complied with that requirement should vote, hold office, practice law, preach, teach or solemnize marriages. But there is a vast difference between the unprecedented severity of those provisions, and the requirement of our present statutes, supra, that a witness may be impeached for veracity by proof of a prior conviction of a criminal offense, either on cross-examination or production of the record. Appellant's. contention on this ground is· entirely unsupported by the authorities, and is overruled. · ·

 The next assignment is that the court erred in admitting in evidence the pistol and bullet with which appellant had shot the deceased. The reason given is that both before and when they were offered in evidence appellant's counsel admitted appellant shot the deceased with the pistol and bullet, thereby making their introduction unnecessary. The decision relied on is State v. Long, 336 Mo. 630, 642, 80 S. W. (2d) 154, 160(9). But in that case the exhibit was bloody clothes worn by the deceased. There is no contention in this case that the pistol or bullet were revolting or gruesome. In similar circumstances State v. Ryland, 324 Mo. 714, 718(2), 25 S. W. (2d) 109, 111(2), held that the admission of a pistol was not calculated to inflame the jury or prejudice the theory of self-defense. It is not always true that the accused can forestall the introduction of such exhibits merely by admitting the homicide. State v. Shawley, 334 Mo. 352, 370(6), 67 S. W. (2d) 74, 82(12). In this case the pistol had previously been exhibited to several witnesses; there had been ballistics testimony about it and the bullet, to .which appellant had objected for *insufficiency*; and the pistol had been identified by the State's witnesses Thorpe and Fowler, to both of whom appellant had taken it after the homicide. Certainly, after this prominent display of the pistol before the jury, it was not prejudicial to admit it in evidence formally.

1116

■ Three of the assignments in appellant's brief assail three of the State's instructions. Instruction No. 1 covered: the formal nature of the information as a mere accusation; the presumption of innocence; the State's burden of proof; and the credibility of witnesses. Appellant first challenges paragraph 2 of the instruction, which authorized a conviction if the jury found the evidence established his guilt "to your satisfaction and beyond a reasonable doubt." The contention is that the quoted phrase made the words "satisfaction" and "beyond a reasonable doubt" synonymous, and thereby reduced the legal standard of proof, since satisfaction is a lower degree of mental conviction than belief beyond a reasonable doubt, which latter the law requires. We do not agree. The two expressions were used in the conjunctive.

In Seago v. N. Y. C. Rd. Co., 349 Mo. 1249, 1255(4), 164 S. W. (2d) 336, 341(8), 147 A. L. R. 372, note, a plaintiff's instruction was condemned which required the ■ jury to find "to your satisfaction by a preponderance or greater weight of the evidence" that the defendant had been guilty of the negligence charged. The decision held that "satisfy" means to set the mind at rest or to convince, which is too strong an expression to use in defining the burden of proof by a *preponderance* of the evidence. See also 38 Words & Phrases (Perm. Ed.), p. 252. On the other hand, the use of the expression "satisfied beyond a reasonable doubt" has been approved in a criminal case. Boyd v. Commonwealth, 156 Va. 934, 944, 157 S. E. 546, 550. The language of the instruction here was equivalent to that; and immediately following in the next paragraph the jury were told it was their duty to convict if they found the appellant guilty "to a moral certainly and beyond a reasonable doubt." Furthermore the State's Instruction 13 defined "reasonable doubt" as the condition of mind of a juror after considering all the evidence, when "he has not a firm and abiding conviction to a moral certainty" of the guilt of the defendant. This assignment is overruled.

■ The next complaint is that paragraph 5 of the instruction directed the jury to take into consideration the character of the witness in *weighing his testimony*; and that this was a plain comment on the facts relative to the appellant's character since he was the only impeached witness. Neither of these statements is correct. The instruction says character is to be considered in determining the witness' *credibility* . And appellant was not the only witness impeached. Appellant elicited from the State's witness Otis Honey that he had been sentenced to jail for drunkenness and disturbing the peace, and had been picked up a hundred times for drunkenness. But we are not holding the instruction would have been a comment even if there had been only one impeached witness.

■ The instruction is further assailed for inconsistency because paragraph 4 informs the jury they should acquit if upon a con-

sideration of all the evidence they have a reasonable doubt of appellant's guilt; whereas paragraph 5 says they may reject in whole or in part the testimony of any witness if they believe he has knowingly sworn falsely to a material fact. Appellant asks how the jury could *consider* all the evidence when the instruction authorized them to *reject* it if they thought witnesses had perjured themselves on material matters. This argument substantially follows the reasoning in State v. Willard, 346 Mo. 773, 781(6), 142 S. W. (2d) 1046, 1052 (15), which criticized instructions telling the jury they may *disregard* the whole testimony of a witness if they believe he has wilfully sworn falsely to a material fact. But the instruction here uses the word "reject." A jury could hardly consider evidence and yet disregard it, though after consideration they might reject it. While not receding from the view expressed in the Willard case on the unwisdom of giving such instructions, yet we do not feel justified in holding the instant instruction reversible error in the present state of our law.

Next, appellant asserts that the State's instruction No. 12 was erroneous for nine reasons. Condensed, the first paragraph of the instruction told the jury if they believed from the evidence that appellant went to the house for the purpose of provoking a difficulty or to begin a quarrel with the deceased for the purpose of killing him or doing him some great bodily harm; and if they further found the appellant carried out that purpose, there was no self-defense in the case, however imminent the appellant's peril may have become during the combat in consequence of the deceased's attack upon him. The second paragraph stated the converse: that although the jury believed from the evidence the appellant began the quarrel or provoked the difficulty, yet if they also believed he did so without any felonious purpose to kill or do great bodily harm; and that the deceased thereupon attacked him and forced him to take deceased's life to save his own, then, while the law would not entirely justify the killing on the ground of self-defense, yet the appellant would not be guilty of a higher grade of crime than manslaughter.

The first contention is that there was no evidence to support the instruction. It is true the State's only eyewitness, Otis Honey, did not see the actual shooting; and that appellant testified the deceased was the aggressor and struck him first with a poker. But Honey's testimony indicates appellant was the aggressor. He said that appellant ran up by the side of the deceased, accused him of calling his (appellant's) mother names, "and then they started to fight." Appellant had got his pistol and put it in his pocket only a few minutes before; he left soon after the homicide and tried to dispose of the pistol; he expressed concern about having to go to the penitentiary; and he had threatened to kill the deceased. We think this evidence was sufficient.

The next objection is that this particular instruction did not require the jury to believe *beyond a reasonable doubt* the facts hypothesized therein. But that requirement was fully covered in the State's general instructions 1 and 13. Repetition was unnecessary. State v. Buckner, 335 Mo. 229, 234, 73 S. W. (2d) 73, 76(7); State v. Westmoreland (Mo., Div. 2), 126 S. W. (2d) 202, 203(8).

Other assignments complain of a failure to define "unlawful provocation," "great bodily harm," "difficulty" and "quarrel." The instruction did not use the words "unlawful provocation." It was unnecessary to define the others. 9 West's Mo. Dig. "Criminal Law," sec. 800, pp. 448-451. It is further argued the use of the expression "provoking a difficulty" or "begin a quarrel," without further explanation, left the jury to infer that mere words uttered by the appellant would be sufficient to justify the deceased in assaulting him and at the same time deprive him of the right of self-defense. But the first paragraph is almost a counterpart of one approved in State v. Long, 201 Mo. 664, 675(IV), 100 S. W. 587, 590(4). That case holds such expressions need not be defined. In State v. Malone, 327 Mo. 1217, 1235, 39 S. W. (2d) 786, 793(9), where it was held the words "did not seek the difficulty" called for explanation, there had been *two* difficulties between the deceased and the defendant within a short time, and the question was which one the instruction referred to. Opprobrious words alone may amount to such provocation as will deprive the utterer of the right of self-defense, if they were spoken for the purpose of affording him an opportunity to kill another— as the instant instruction says. See 30 C. J., sec. 213, p. 48, sec. 221, p. 51.

As to the second paragraph, appellant insists it deprived him of the right of self-defense even though he provoked the difficulty without intending to do so. It is true the instruction says if he provoked the difficulty without *felonious* intent to kill or do great bodily harm, the grade of the offense would be reduced to manslaughter— which would nullify self-defense as a defense. Taken literally this particular language might be tortured into a meaning that the appellant provoked the difficulty unintentionally, for that would come within the expression "without felonious intent"—it would be without any intent at all. But the whole context of the instruction shows the second paragraph was conditioned on the hypothesis that appellant provoked the difficulty intentionally but not feloniously.

The final point made is that the second paragraph of the instruction says, in effect: if appellant first provoked the difficulty; and deceased next attacked him with a poker; and thereupon appellant assaulted and shot the deceased; then appellant had no right of self-defense, no matter how imminent his peril. Appellant insists this is wrong. In challenging the instruction he strongly relies on State v. Malone, supra, 327 Mo. 1. c. 1235, 39 S. W. (2d) 1. c. 793(9).

That case ruled the defendant could claim self-defense as against the deceased's attack, although there was evidence that the defendant had shortly theretofore had a difficulty with the deceased. But in between the defendant had gone to his home, returned with a pistol, and in a second difficulty had shot and killed the deceased. This court held that if he did not provoke the second difficulty with a purpose to kill the deceased or do him bodily injury, and acted only in self-defense, he did not lose his right to invoke that defense. See also such cases as State v. Heath, 237 Mo. 255, 267, 141 S. W. 26, 29, and State v. Gadwood, 342 Mo. 466, 491(7) 116 S. W. (2d) 42, 56(20).

But those cases were on the theory of *withdrawal* from the conflict. There, on a proper showing, the defendant retains his full right of self-defense, even though he may have provoked the original difficulty. In this case, however, instruction No. 12 was on an entirely different theory of so-called *imperfect* self-defense. The latter does not require abandonment of the conflict as an essential element. The instruction simply presented the question whether the defendant provoked the difficulty in which the deceased was killed, without a felonious intent to kill or do great bodily harm, in which event he would only be guilty of manslaughter. 30 C. J., sec. 221, p. 52; State v. Painter, 329 Mo. 314, 325, 44 S. W. (2d) 79, 82; State v. Williams, supra, 337 Mo. l. c. 893(3e), 87 S. W. (2d) l. c. 179(5), 100 A. L. R. 1503; State v. Ferguson (No. 38857), 353 Mo. —, 182 S. W. (2d) 38).

We think the instruction was correct on the point to which it was directed. There was no request below for a self-defense instruction on the other theory—of abandonment of the conflict. And while appellant was not bound to request such an instruction, if there was evidence warranting it, since it would have been a part of the essential law of the case under Sec. 4070(4); yet, it was at least necessary for him to preserve the point in his motion for new trial. State v. Burrell, 298 Mo. 672, 678-9, 252 S. W. 709, 711(1). The 21st assignment in the motion does charge generally that "the court erred in not instructing the jury on all the law in the case." But it has been consistently held that the new trial statute, Sec. 4125, requires such assignments must be specific, indicating the point which the instruction should have covered. State v. Bagby, 338 Mo. 951, 965(7), 93 S. W. (2d) 241, 249(18); State v. Brown, 165 S. W. (2d) 420, 422(6).

Appellant says the State's instruction No. 3 was a comment on the evidence and invaded the province of the jury. The opening paragraph stated the familiar abstract proposition of law that one who wilfully, that is, intentionally, uses upon another at some vital part, a deadly weapon, must in the absence of qualifying facts, be presumed to know that the effect is likely to be death; and knowing this,

must be presumed to intend death, which is the probable and ordinary consequence of such an act, and if such deadly weapon is used without just cause or provocation, he must be presumed to do it wickedly and from a bad heart. The second paragraph proceeded to apply the above principles to the facts. In our opinion it would be better to eliminate such abstractions from criminal instructions. But the instruction states the law and has been approved. State v. Hart (Div. 2), 309 Mo. 77, 274 S. W. 385, 386-7(5); State v. Dollarhide, 333 Mo. 1087, 1089(2), 63 S. W. (2d) 998, 999(3).

The final assignment complains of prejudicial closing argument by the prosecuting attorney, when he said: "Now, gentlemen, I am about to close. Upon you now rests the duty of carrying forward this prosecution." Appellant's counsel objected that the jury "have no duty whatever of carrying on the *prosecution*;" and moved that the prosecuting attorney be rebuked. The court replied: "I don't suppose he means that they will carry on the prosecution. What he means, I suppose, is that they have their place. Overruled." Appellant excepted to the ruling and to the court's refusal to *rebuke* counsel, but that was all. The prosecuting attorney has a right to request the jury to do their full duty in enforcing the law. 23 C. J. S., sec. 1107, p. 583; 16 C. J., sec. 2260, p. 910. And the court may exercise a sound discretion in controlling the argument. 23 C. J. S., sec. 1083, p. 522, sec. 1116, p. 600. But in view of the nature of the objection made in this instance, and the interpretation put upon counsel's remark by the court in ruling on it, we think there was no error. State v. Carter, 345 Mo. 74, 77(4), 131 S. W. (2d) 546, 548(5); State v. Nichols, 327 Mo. 1237, 1242(4), 39 S. W. (2d) 777, 780(4-7); State v. Barker, 322 Mo. 1173, 1180, 18 S. W. (2d) 19, 21(4).

Finding no reversible error, the judgment is affirmed. All concur.